# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL WILLIS, | ) | 1:05-cv-01132 JMD |
| | ) | |
| Plaintiff, | ) | ORDER REGARDING PLAINTIFF'S |
| | ) | SOCIAL SECURITY COMPLAINT |
| v. | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## BACKGROUND

Plaintiff Michael Wills[1] ("Michael"), by and through his guardian ad litem, Betty Wills (hereinafter referred to as "Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable John M. Dixon, Jr., United States Magistrate Judge.[2]

---

[1] Plaintiff submitted the Complaint in this matter with a caption identifying the claimant as "Michael Willis." This appears to be in error as the administrative record and subsequent pleadings filed with this Court refer to Plaintiff as "Michael Wills."

[2] The parties consented to the jurisdiction of the United States Magistrate Judge. On March 23, 2006, the Honorable Oliver W. Wanger reassigned the case to the Honorable Sandra M. Snyder for all purposes. On August 10, 2007, the Honorable Garland E. Burrell, Jr., reassigned the case to the undersigned for all purposes.

## **FACTS AND PRIOR PROCEEDINGS**[3]

On April 19, 2002, Plaintiff protectively filed an application for SSI benefits. AR 56. Plaintiff alleged that Michael had been under a disability since October 1, 2001, due to a heart condition. AR 56. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 42-45, 47-50, 51. On January 5, 2004, ALJ Richard Goodwin held a hearing. AR 356-369. On September 8, 2004, ALJ David E. Flierl held a supplemental hearing. AR 370-391. ALJ Flierl denied benefits on February 7, 2005. AR 10-18. On July 15, 2005, the Appeals Council denied review. AR 5-7.

Hearing Testimony

*September 8, 2004*

ALJ Flierl held a hearing in Bakersfield, California. AR 370, 372. Plaintiff and Michael appeared at the hearing with counsel. AR 372.

Plaintiff Wills testified that she is Michael's mother. AR 374. When Michael was born, he was not noted to have a heart problem or any other problems. AR 374. He developed problems later. AR 375. His heart started beating "real fast" when he was about 2. AR 375. Plaintiff Wills took Michael to the doctor. AR 375. The doctor said that Michael had a heart murmur. AR 375. He is being treated for that now. AR 375. Plaintiff Wills was having Michael treated by Dr. Fox., but he is going to be treated at Valley Children's Hospital in Madera. AR 375. They will do x-rays, treat him and give him medication. AR 375. Michael is on allergy medicines and pain medication for pains in his legs. AR 375. He does not take medication for his heart. AR 376. When Plaintiff Wills took Michael to San Joaquin, they gave him a shot to slow his heart. AR 376.

Plaintiff Wills testified that Michael gets tachycardia. AR 376. It slows him down, and it slows his heartbeat down. AR 376. He always is tired. AR 376. He sleeps more than eight hours a day. AR 376. When he gets out of school, the first thing he does is go to sleep. AR 376.

---

[3] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

He talks about his legs hurting, which is why he gets pain medication. AR 376. He also sees a psychologist. AR 376.

Plaintiff Wills also testified that Michael is a little small for his age. AR 376. His legs "swell up real bad" and they give him pain medication. AR 376. He takes a whole bunch of different medicines. AR 377. He is taking Prednisone and some breathing medications. AR 377. He had Valley fever, too. AR 377.

Plaintiff Wills testified that Michael is "not doing too good." AR 377. The doctor put him on more medicine. AR 377. Michael is seeing a psychologist because when he gets upset his heart beats faster. AR 378. They are teaching him "how not to get upset, and control his anxiety." AR 378.

Plaintiff testified that Michael does not finish his homework most of the time. AR 378. He sometimes finishes things. AR 378.

Michael has been back to the hospital since December of 2003. AR 378. Michael was allergic to the motel they were staying at and it made his heart beat a little fast. AR 378. He broke out from head to toe and Plaintiff Wills had to rush him to the hospital. AR 378.

Michael has never lost consciousness, but he gets so weak that he cannot get up. AR 378. He had scabies for a while. AR 378-379. It is okay now, but he has to watch where he is at, and Plaintiff has to watch what clothes and the washing powder. AR 379. They cannot stay at the motel where they were living. AR 379. They have to watch wherever they stay. AR 379.

Plaintiff Wills indicated that Michael is doing a little bit better in school, but he still has "a little problem" at home. AR 379. He is not missing as much school. AR 379. He has been getting a little better medical attention. AR 379. When he gets medical attention, he does a little better. AR 379.

Michael was in the fifth grade at the time of the hearing, but he was supposed to be in the seventh grade. AR 379. He was born in '92 and was 12 at the time of the hearing. AR 380. He can tell time. AR 380. He can read some of a newspaper. AR 380. He can cut with a knife. AR 380. He can ride a bike. AR 380. He does not get along with his brothers and sisters. AR 380. He argues with his sister and they cannot get along. AR 380. He sometimes follows the

1  rules that his mother gives him.  AR 380.  You have to keep on him to do housework.  AR 381.
2  He does not finish things when his mother does not "keep on him."  AR 381.

3  Plaintiff Wills testified that Michael has never harmed a pet.  AR 381.  When he gets real
4  mad, he will bang on the wall or he will destroy things.  AR 381.  He abuses and destroys things.
5  AR 381.

6  Michael sees Dr. Fox sometimes once a month and sometimes twice a month.  AR 381.
7  Dr. Fox treats his heart and everything.  AR 381.  The psychiatrist or psychologist that Michael
8  sees is named "Mark."  AR 381.  Plaintiff Wills did not remember his last name.  AR 382.
9  Michael is supposed to see Mark at Henrietta Weill[4] every two weeks.  AR 382.  Michael also
10  sees a counselor at school for "not getting along" and "helping out."  AR 382.  He has not been
11  suspended from school.  AR 382.  Every once in awhile he gets in fights at school, but he has not
12  lately.  AR 382.

13  Plaintiff Wills testified that Michael's biggest problems now are his heart, his legs and his
14  allergies.  AR 382-383.  When he has a flare-up with the pain in the legs and the heart, he stays
15  home or his mother gives him pain medication.  AR 383.  Then he comes home and lies down.
16  AR 383.  If he feels "real bad," his mother tells him to let the school know "so they'll let him rest
17  at the schoolhouse if he needs to."  AR 383.

18  Plaintiff Wills testified that Michael misses more than two days a month at school.  AR
19  383.  If he had a job, he would miss more than two days a month.  AR 383.

20  She reported that when Michael goes to the psychiatrist, he falls right off to sleep.  AR
21  383.  The psychiatrist lets him sleep for a while and then takes him in.  AR 383.  He is more
22  concerned about Michael sleeping.  AR 383.

23  In response to questions from the ALJ, Plaintiff Wills testified that Michael is in regular
24  education.  AR 384.  They are supposed be helping him "get back in the speech and therapy."
25  AR 384.  He just started the fifth grade.  AR 384.  He is on a regular schedule from August to
26  June.  AR 384.

---

[4]The trascript identifies this site as the "Henrietta Will" Center.  AR 382.  The medical record identifies this site as the "Henrietta Weill Memorial Child Guidance Clinic."  AR 175.  For convenience, the Court will refer to this site as "Henrietta Weill."

Plaintiff Wills testified that when Michael plays basketball, he will lie down, be in a lot of pain and need to take his pain medications.  AR 384.  The doctor gives him some Tylenol with codeine.  AR 384.  Sometimes "he misses school behind that."  AR 384.

Plaintiff Wills reported that Michael stayed back from school for two years because of his heart.  AR 384.  He had surgery for tonsils, but they had to "put off" for a month because his heart was acting up.  AR 384.  He went back and forth to the doctors.  AR 384.  They took him at UCLA, had the heart monitor on him and then they took him back off of it.  AR 385.  Then he broke out, he got sick again and his legs were bothering him.  AR 385.  He missed school behind that, too.  AR 385.

Plaintiff Wills testified that Michael participates in physical education a little bit.  AR 385.  The nurse says he can go as far as he can, but when he gets tired he can just relax.  AR 385.  He does not have to go as far as the rest of the kids.  AR 385.  He has an asthma inhaler.  AR 385.  He is on a lot of medications.  AR 385.  He does not feel like eating because of his medications.  AR 385.

In response to questions from the ALJ, Plaintiff Wills testified that Michael missed school in 2002 because he was sick.  AR 385- 386.  The doctor would excuse him from school and he had Valley Fever for a little bit.  AR 386.  Plaintiff Wills did not think that Michael went to summer school in 2002.  AR 386.  She was in the hospital during that time.  AR 386.

Plaintiff Wills reported that there are four people in the household.  AR 386.  She is living with "their grandmother," Plaintiff Wills, Michael and Plaintiff Wills' daughter  AR 386.  Her house got sold, so they had to move out.  AR 386.

In June of 2002, the living situation was Plaintiff Wills, Michael, her daughter and one of her older sons.  AR 386.  Michael and her older son got along to a certain extent.  AR 386.  Plaintiff Wills was trying to think which one was home.  AR 386.  Michael got along with the oldest one better.  AR 386.  Michael and her other son argued a lot.  AR 386.  She could not think which one was home because one would be in jail and the other would come into town and watch Michael when she was in the hospital.  AR 386-387.

Plaintiff Wills testified that Michael has been having chronic fatigue for a long time.  AR 387.  For five years, he has been getting worse.  AR 387.

Michael came close to being suspended from school.  AR 387.  About three years prior, he was sent home from school because he and a little boy "got into it."  AR 387.

Plaintiff Wills testified that Michael's leg problems were more severe than his other problems.  AR 388.  His legs ache and swell up a little bit, especially in his kneecap and another spot.  AR 388.  He sometimes cries when his legs hurt.  AR 388.  His mother gives him his medicine, which stops it, and he lies down.  AR 388.  She gives him Tylenol, Tylenol with codeine and Motrin.  AR 388.

Plaintiff Wills reported that Michael also takes "Zithronex" for pain.  AR 388.  He sometimes takes Tylenol with codeine every other day.  AR 389.  He also has Motrin.  AR 389.

Plaintiff Wills testified that when Michael comes home, he normally has homework to do.  AR 389.  He does not do it on his own.  AR 389.  She has to tell him.  AR 389.  Plaintiff Wills normally checks over his homework or his grandmother does.  AR 389.  When he gets home from school, he will sleep about three hours.  AR 389.  He then will get up and they will tell him to do his school work.  AR 389.

To Plaintiff Wills' knowledge, there have not been any injuries to Michael's legs that would account for the problem that he has.  AR 390.

Medical Evidence

*School Records*

In April 1999, Michael scored below average for first graders in reading and had a low score in mathematics.  AR 94.  In May 1999, Michael's first grade teacher recommended that he be retained.  AR 110.  He was retained in the first grade.  AR 113.  The following school year, between September 1999 and June 2000, Michael was absent 53 days from first grade.  AR 105-106.

Between September 2000 and May 2001, Michael was absent from the second grade for a total of 51 days out of 180 enrolled days.  AR 103-104.  In April 2001, Michael scored below basic California state standards in English Language Arts.  AR 92.

Between September 2001 and May 2002, during his third grade year, Michael was absent from school for a total of 90 days out of 180 enrolled days. AR 100-102. In December 2001, Michael's school district notified Plaintiff Wills that Michael was at-risk for retention. AR 109. In April 2002, Michael scored far below basic California state standards in English Language Arts and in Math. AR 95. In May 2002, Michael's school district notified Plaintiff Wills that Michael would be retained in the third grade due to attendance and academic achievement. AR 108. In December 2002, Michael passed his school district screening for speech and language. AR 107.

*Medical Records*

On July 20, 2001, Michael received treatment at Kern Medical Center for knee pain, snoring and mouth breathing. AR 263. Michael was assessed with hypertrophied adenoids and tonsils. AR 263. In August 2001, Michael again was assessed with hypertrophied tonsils. AR 262. Treatment notes from October 2001 indicated that Michael was to have a tonsillectomy, but it was cancelled until he received cardiac clearance. AR 255, 256.

On September 10, 2001, Michael received treatment at Kern Medical Center for complaints of leg pain and intermittent hip pain. AR 261. He was diagnosed with tendinitis. AR 261.

On October 16, 2001, a memorandum prepared by the Sagebrush Clinic indicated that Michael was undergoing investigation of a heart condition, which required a decrease of physical activity during the process. AR 312. On October 18, 2001, Michael had a normal echocardiogram. AR 250.

On October 24, 2001, Michael saw Parameswaran Aiylam, M.D. at Sagebrush Medical Plaza for follow-up of his heart. AR 249. Dr. Aiylam noted that Michael's echocardiogram was normal. AR 249. He assessed Michael with an innocent murmur and reported that Michael could undergo the tonsillectomy. AR 249.

On November 14, 2001, Michael underwent a tonsillectomy with adenoidectomy. AR 239, 240-241. He received follow-up care on November 27 and December 11, 2001. AR 237, 238.

On January 18, 2002, Michael sought treatment at Kern Medical Center for chest wall pain. AR 235. No medications were required. AR 235.

On January 24, 2002, Michael was diagnosed with scabies. AR 234. He subsequently was diagnosed with recurrent scabies on January 29, 2002. AR 232.

On February 8, 2002, Michael received emergency treatment at Bakersfield Memorial Hospital for intermittent chest pain. AR 135-136. During transportation to the hospital by ambulance, Michael had an irregular ECG rhythm. AR 137-138. In the emergency room, he had a borderline ECG. AR 140-142. Chest x-rays were negative. AR 134.

On February 11, 2002, Michael sought treatment for chest pain at the costochondrial junction. AR 230. He also complained of knee pain. AR 230.

On February 12, 2002, Michael received treatment from Dr. Aiylam for follow-up of his hospital visit and pediatric clinic visit for chest pain. AR 228. Dr. Aiylam noted that a chest x-ray completed the previous day was normal. AR 228. Dr. Aiylam planned to repeat the EKG and prescribed Motrin for pain. AR 228. A February 13, 2002, EKG contained a noted indicating "Sinus arrhythmia Probably normal." AR 227.

On February 25, 2002, Michael sought treatment from Christopher Westfall, D.O., at Sagebrush Medical Plaza for complaints of vomiting and cough. AR 220-222. Dr. Westfall indicated that Michael had been seen multiple times in the past month for various complaints ranging from chest pain to persistent cough to vomiting. AR 220. Dr. Westfall consulted with Dr. Taher and Michael was given a trial of albuterol MDI for two weeks to see whether the vomiting resolved when the post-tussive episodes and cough were decreased. AR 220.

On February 26, 2002, Sabrina Sherrill, MFT, from Henrietta Weill, conducted an assessment of Michael. AR 175-179. The primary concerns identified during the assessment included Michael's school attendance, anger, impulsive behavior and running away, which were described as moderate. AR 175. On mental status exam, Michael was restless and distracted. AR 177- 178. He seemingly had poor insight and poor judgment. AR 178. Therapist Sherrill's diagnostic impression was Conduct Disorder, Early Onset. AR 178. She assigned Michael a

Global Assessment of Functioning ("GAF") of 35. AR 178. He had functional impairments in the areas of relationships with others and education and learning. AR 178.

On March 13, 2002, Plaintiff Wills and Michael met with Karen Moniz-Smith, MFT intern, from the Kern County Mental Health System of Care to develop a Plan of Care for Michael related to his conduct disorder. AR 168-169. The plan of care contained a goal for Michael to increase his appropriate expressions of emotions from 40% of the time to 75% of the time. AR 168. Between March 2002 and June 2002, Michael and his mother met with Ms. Moniz-Smith on eleven occasions to discuss issues related to his conduct disorder symptoms. AR 148, 151, 155, 156, 159, 160, 16, 162, 163, 165, 167.

On March 24, 2002, a state agency physician completed a Childhood Disability Evaluation Form. AR 305-310. Michael was noted to have allergies, behavior disorder, heart, leg pains, arthritis and learning disorder impairments. AR 305. The state agency physician opined that Michael's impairment (or combination of impairments) was severe, but did not meet, medically equal or functionally equal the listings. AR 305. The physician further opined that Michael had less than marked limitations in acquiring and using information, attending and completing tasks, health and physical well-being. AR 307, 309. He had marked limitations in interacting and relating with others. AR 307. He had no limitations in moving about, manipulating objects and caring for himself. AR 309. On September 24, 2002, psychiatrist Luyen T. Luu, M.D., also signed the evaluation form. AR 306.

On April 4, 2002, Michael was diagnosed with scabies. AR 210. He had a faint, resolving, papular, puritic rash all over his trunk and extremities. AR 210. His scabies had resolved by April 10, 2002, and his mother requested a note for him to return to school. AR 208.

On April 26, 2002, Plaintiff Wills completed a Function Report-Child form regarding her son's limitations. AR 61-70. Plaintiff Wills reported that Michael had problems seeing due to headaches. AR 62. He did not have problems, hearing, talking or communicating. AR 62-64. He could not read simple words, read and understand simple sentences, read and understand stories in books or magazines, spell most 3-4 letter words, write a simple story or know the days of the week and months of the year. AR 65. Plaintiff Wills indicated that Michael's physical

abilities were limited. AR 66. He tired easily, his legs ached constantly, he upset easily and had frequent nose bleeds. AR 66. She reported that Michael did not have friends his own age. AR 67. His impairments did not affect his ability to help himself. AR 68. His ability to pay attention and stick with a task was limited. AR 69. He did not finish things he started, did not complete homework and did not complete chores most of the time. AR 69.

On May 6, 2002, Michael sought treatment at Kern Medical Center for a short episode of fast heartbeats while asleep and knee discomfort. AR 206. A Holter Monitor was scheduled and he was referred to pediatric cardiology at UCLA. AR 206-207. On May 30, 2002, Michael's Holter tracing was normal, with no significant supraventricular or ventricular arrhythmias. AR 205.

On June 6, 2002, Jonathan Baca, a Case Manager at Henrietta Weill, met with Michael's teacher to discuss Michael's conduct disorder symptoms. AR 150. Michael's teacher indicated that Michael's attendance was the number one problem. AR 150. His teacher also reported that Michael had the potential to do the work, but was not in school enough to learn anything. AR 150. Michael's teacher reported that he would be passing this year and would be eligible for summer school. AR 150.

On July 31, 2002, Chuck K. Lee, M.D., completed a consultative evaluation of Michael due to his history of arrhythmia. AR 186. On physical examination, Michael had a sinus arrhythmia, a heart rate of 81 per minute, and a grade 2/6 systolic murmur heard over the left sternal boarder. AR 186. Dr. Lee indicated that Michael was being referred to UCLA because of the persistence of his irregular heart beat and accompanying chest pain. AR 187. Dr. Lee opined that Michael's other medical problems were relatively mild, including allergies and a mild case of asymptomatic valley fever. AR 187.

On August 27, 2002, Michael's third grade teacher, Kathy McDonnell, completed a Teacher's Questionnaire form. AR 281-287. Ms. McDonnell noted that Michael had academic problems as a result of not being sent to school and if he attended school he would improve greatly in academic areas. AR 282. Michael did not have any visual, hearing, speech or hand-eye coordination problems. AR 282. He did not have difficulty using a pen or pencil, turning

1  pages, standing, walking, running, grasping or carrying weights.  AR 284.  He was able to
2  participate in group situations and get along well with other children.  AR 284.  He was involved
3  in all class activities when he attended.  AR 285.

4  On September 11, 2002, licensed psychologist Michael G. Musacco, Ph.D., of Kern
5  Psychological Services, Inc., completed a consultative evaluation of Michael.  AR 188-191.
6  Psychological testing revealed possible mild deficits in Michael's visual motor functioning, a
7  borderline range full scale IQ score of 77 and a borderline to mildly impaired adaptive behavior
8  scores.  AR 189-190.  Dr. Musacco diagnosed Michael with Depressive Disorder NOS,
9  Borderline Intellectual Functioning and a History of Heart Problems.  AR 191.  Dr. Musacco
10 opined that Michael's depressive disorder was offered to account for Michael's report of
11 depressive symptoms, including feelings of sadness, loneliness, low self esteem and occasional
12 thoughts about wishing he were not alive.  AR 191.  Dr. Musacco indicated that he did not obtain
13 information from Michael's mother to support a diagnosis of conduct disorder.  AR 191.

14 On December 13, 2002, Michael received treatment at Kern Medical Center for
15 palpitations.  AR 192-193.  The provider recommended that Michael cut down on his albuterol
16 and try other asthma medications.  AR 193.

17 On December 19, 2002, Michael's teacher, Vada Meyers, completed a Teacher
18 Questionnaire form.  AR 271-278.  Ms. Meyers opined that Michael was an average student, but
19 did not turn in all of his work.  AR 271.  He had an unusual number of absences.  AR 271.Ms.
20 Meyers also opined that he had no problem comprehending oral instructions, understanding
21 school and content vocabulary, reading and comprehending written material, comprehending and
22 doing math problems, understanding and participating in class discussions, providing organized
23 oral explanation and adequate descriptions, learning new material recalling and applying
24 previously learned material or applying problem-solving skills in class discussions.  AR 272.  He
25 had a slight problem expressing ideas in written form.  AR 272.  Ms. Meyers noted that he could
26 do the work independently, but he had a very serious problem completing homework
27 assignments on a daily basis.  AR 273.  He did not have problems interacting and relating with
28 others, moving about or manipulating objects.  AR 274-275.  He had a slight problem caring for

his physical needs (bathing). AR 276. Ms. Meyers further opined that she did not see any physical signs of Michael being sick at school and that he seemed to be a "very healthy child." AR 277.

On March 3, 2003, Carmen DeLaRosa, M.D., completed a Childhood Disability Evaluation Form. AR 297-302. Dr. DeLaRosa identified Michael's impairments to include allergies, arthritis, behavior disorder, learning disorder and heart. AR 297. She opined that his combination of impairments was severe, but did not meet, medically equal or functionally equal the listings. AR 297. He had less than marked limitations in acquiring and using information, attending and completing tasks, caring for himself, health and physical well-being. AR 300-301. He had no limitation on interacting and relating with others or moving about and manipulating objects. AR 300-301. On March 4, 2003, psychiatrist Marina C. Vea, M.D. also signed the evaluation form. AR 298.

In May 2003, Michael complained of a rapid heart beat and leg pain just below the knees. AR 334, 335.

On July 11, 2003, Michael was diagnosed with tachycardia (rule out lupus). AR 333. He was referred to the Sagebrush Pediatric Cardiology clinic. AR 333.

On August 21, 2003, Michael sought treatment for bilateral leg pain. AR 332. An x-ray of his knees was ordered and he was prescribed Motrin for pain. AR 332. X-rays of his knees and ankles were normal. AR 332.

In January 2004, a Plan of Care was developed with Michael and his mother through the Kern County Mental Health System of Care by Mark Corey, A.C.S.W., to address Michael's conflicts with others. AR 314-316.

On March 19, 2004, Michael received treatment for complaints of bilateral leg pain and dermatitis. AR 329. He was diagnosed with facial acne and myositis and was prescribed Motrin for pain. AR 329.

On April 13, 2004, Michael received treatment for complaints of chest pain, coughing, abdominal pain, swollen legs and an inability to sleep. AR 327. He was diagnosed with chest pain, gastroenteritis and tachycardia. AR 327. Jerry C. Fox, M.D., of Kern Family Health Care

referred Michael to Pediatric Cardiology. AR 327, 328. The referral/authorization form noted that the authorization to Dr. Allade at UCLA was being closed. AR 328.

On April 29, 2004, Dr. Tam completed a consultative cardiovascular examination of Michael. AR 317-319. On review of systems, Michael's mother reported that he tires easily, but Dr. Tam noted that he plays basketball and does fine. AR 317. His mother indicated that he had shortness of breath and chest pressure, but Michael reported that he was able to play basketball without any difficulties. AR 317-318. Dr. Tam noted that Michael's history was consistent with intermittent arrhythmia of an undetermined type. AR 318. Dr. Tam opined that he was unable to review Michael's records, but Michael did not appear to be disabled physically. AR 318. Dr. Tam noted that Michael may have a problem with arrhythmia that had been undiagnosed and untreated. AR 318. He indicated that Michael was not on cardiac medications. AR 318.

On May 28, 2004, Michael received follow-up treatment for continued chest pain, leg swelling and difficulty sleeping. AR 323. Michael was assessed with chest pain and fatigue. AR 323. A lead check was requested. AR 323.

On June 1, 2004, Michael was referred to Children's Hospital Central California for tachycardia. AR 322.

On July 15, 2004, Michael received treatment for a rash, face swelling, fever, throat and breathing problems, along with a fast heartbeat. AR 320. He was assessed with allergic dermatitis and dyspnea. AR 320.

On September 10, 2004, Michael began wearing a heart monitor for a one month period. AR 343. It was a patient activated recording of the heart's electrical activity. AR 343. Normal activities at school, including physical education, were encouraged by the Children's Hospital Central California physician, u less otherwise restricted. AR 343.

An undated note from Dr. Jerry Fox indicated that Michael was being evaluated for chronic fatigue and was scheduled to see a cardiologist for palpitations. AR 342.

On November 15, 2004, Harold Mills, M.D., reviewed Michael's status and completed a Childhood Disability Evaluation Form at the request of ALJ Flierl. AR 349, 350-355. In his correspondence to ALJ Flierl, Dr. Mills opined that Michael "most likely has no significant

medical problems." AR 349. On the Childhood Disability Evaluation Form, Dr. Mills identified Michael's impairments as alleged cardiac disease with arrhythmias. AR 350. Dr. Mills indicated that he did not address Michael's learning disabilities and psychiatric problems. AR 350. Dr. Mills found that Michael's impairment was not severe and noted that no serious arrhythmia ever had been documented. AR 350. Dr. Mills explained that Michael's electrocardiogram exhibited voltage changes suggestive of left ventricular hypertrophy, but that diagnosis had not been validated by Cardiology Consultants, chest x-ray or echocardiogram. AR 355. Dr. Mills opined the ECG could be an "innocent variant finding" and had no clinical significance. AR 355. Dr. Mills further opined that the intermittent heart murmur was "most likely an innocent murmur," and if a significant arrhythmia was documented in the future it likely could be controlled easily or eradicated. AR 355.

ALJ's Findings

The ALJ found that Michael had not engaged in any substantial gainful activity since the application date. AR 17. His heart problems, depressive disorder not otherwise specified, borderline intellectual functioning and conduct disorder were considered "severe," but did not meet, medically equal or functionally equal the criteria of any Medical Listing in Appendix 1, Subpart P, Regulation No. 4. AR 17. The ALJ determined that Michael's allergies and leg pain were non-severe. AR 17. The ALJ found that the allegations of marked and severe functional limitations were not supported by the medical evidence and were not fully credible. AR 17. The ALJ concluded that Michael was not under a "disability." AR 17.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401

(internal quotation marks and citation omitted).  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the correct legal standards and if the Commissioner's findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a child is considered disabled if he has a medically determinable physical or mental impairment, which results in marked or severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(C)(I).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a three-step sequential disability evaluation process for determining whether a child's impairment results in marked and severe functional limitations and, therefore, is disabled.  20 C.F.R. § 416.924 (b)-(d) (2005).  The relevant inquiry at step one is whether the child is engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  If not, step two requires the fact finder to determine whether the child has a medically severe impairment or combination of impairments.  20 C.F.R. § 416.924(c).  Plaintiff bears the burden of demonstrating a severe impairment.  20 C.F.R. § 416.924.  If the impairment is a "slight abnormality or a combination of slight abnormalities that cause no more than minimal functional limitations," the Commissioner will find that the child does not have a severe impairment and, therefore, is not disabled.  20 C.F.R. § 416.924(c).

If the child has a severe impairment, step three requires determining whether the impairment meets or medically equals in severity any impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 416.924(d).  If such an impairment exists, the Commissioner must find the child disabled.  *Id.*  If the child's impairment does not meet or

medically equal any listing, then the Commissioner must determine if the limitations caused by the impairment functionally equal a listing in the Listing of Impairments. 20 C.F.R. § 416.926a. To do so, the Commissioner will assess all of the functional limitations caused by the child's impairment in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(I)-(vi). To functionally equal a listing, the impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). Applying the sequential evaluation process in this case, the ALJ found that: (1) Michael has not engaged in substantial gainful activity; (2) Michael has an impairment or combination of impairments that is considered "severe" under the Social Security Act (heart problems, depressive disorder, not otherwise specified, borderline intellectual functioning and conduct disorder); and (3) the impairments do not meet, medically equal or functionally equal any of the medical listings in Appendix 1, subpart P, Regulation No. 4. Thus, the ALJ found that Michael was not under a disability as defined in the Social Security Act. AR 17.

Plaintiff challenges the ALJ's decision and contends that the ALJ impermissibly ignored the testimony of Michael's mother, Betty Wills.

## DISCUSSION

A.    Lay Witness Testimony

Plaintiff argues that the ALJ failed to consider the lay witness testimony of Michael's mother, Plaintiff Wills. Lay witness testimony as to a claimant's symptoms is competent evidence that the Commissioner must take into account. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ may reject such testimony if he does so expressly, in which case "he must give reasons that are germane to each witness." *Id.* Here, Plaintiff argues that "nowhere in his decision does the ALJ properly discuss or mention Betty Wills's testimony" and the ALJ fails to provide a single reason for rejecting Betty Wills's testimony. Plaintiff's Opening Brief, p. 4. Plaintiff's argument is without merit.

First, the ALJ did not ignore the testimony and allegations presented by Betty Wills. The ALJ expressly rejected the testimony of Michael's "family about the severity of the claimant's functional limitations." AR 15. The ALJ determined that "the statements and testimony were not supported by the medical and school evidence and therefore not entirely credible under Social Security Ruling 96-7p." AR 15. In reaching his determination, the ALJ expressly discussed the medical evidence and the school evidence that contradicted both the third-party Function Report completed by Betty Wills and her testimony. AR 14, 15-16. In so doing, the ALJ considered Betty Wills' allegations regarding Michael's functional limitations in contrast with the consultative evaluations completed by Drs. Tam and Lee, the consultative psychologist's evaluation completed by Dr. Musacco and the Teacher's Questionnaires completed by Ms. Meyers and Ms. McDonnell. AR 14, 15-16. Further, in the ALJ's discussion of the evidence that contradicted Ms. Wills' allegations, the ALJ specifically referenced her testimony regarding Michael's shortness of breath, his chest pressure, how he tires easily, his arguments with siblings and the amount of school he misses due to illness. AR 14, 15-16.

Insofar as Plaintiff contends the ALJ's reasoning for rejecting Plaintiff Wills' testimony as not supported by objective evidence was legally insufficient, this contention is without merit. An ALJ may properly discount lay testimony that conflicts with the available medical evidence. *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984). As discussed above, the ALJ contrasted Plaintiff Wills' contentions with both the medical evidence and school record. This was not error.

Second, this is not a situation where the ALJ ignored an entire line of significant probative evidence. See *Cotter v. Harris*, 642 F.2d 700, 706-707 (3d Cir. 1981) (Commissioner must explain why "significant probative evidence has been rejected"). The ALJ thoroughly discussed the third party statement completed by Plaintiff Wills concerning Michael's impairments and daily activities, which essentially was corroborated by her hearing testimony. For example, the ALJ considered Ms. Wills' statements in the Function Report that Michael does not finish things he starts, does not complete homework and does not complete chores most of the time. AR 16. Ms. Wills provided similar testimony at hearing, indicating that she has to

keep on him to do housework or finish things and he does not finish his homework or do it on his own. AR 378, 381, 389. The ALJ also considered Ms. Wills' statements in the Function Report that Michael does not have friends his own age and gets upset easily. AR 16. Ms. Wills provided similar testimony at the hearing, reporting that Michael does not get along with his siblings, he sees a psychologist to teach him how not to get upset and he sees a counselor at school for "not getting along." AR 378, 380, 382. Additionally, the ALJ considered Ms. Wills' allegations in the Function Report that Michael tires easily. AR 16. Ms. Wills provided related testimony at the hearing, indicating that he always is tired, he sleeps more than eight hours a day and he has chronic fatigue AR 376, 387. Because the ALJ discussed Ms. Wills' third-party statement, which was corroborated by her testimony at hearing, the ALJ did not disregard significant probative evidence and did not err by discounting her repetitive third party testimony. *Cf. [Carlson v. Shalala, 999 F.2d 180 (7th Cir. 1993)](#).*(ALJ did not err by failing to discuss redundant third party testimony).

## **CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Michael Wills.

<u>IT IS SO ORDERED.</u>

**Dated:    October 22, 2007              /s/ John M. Dixon**
                                                              UNITED STATES MAGISTRATE JUDGE